Page 1

(1)
(2) UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
(3) ------------------------------X
    JUDITH H. WEISS,
(4)
    PLAINTIFF,
(5)
(6) -against- Case No:
    07CV5712
(7)
(8) FRANCES M. CREEM and BETTY OLSON,
(9) DEFENDANTS.
    ------------------------------X
(10)
(11) DATE:    October 26, 2007
(12) TIME:    10:00 a.m.
(13)
(14) EXAMINATION BEFORE TRIAL of the
(15) Plaintiff, JUDITH H. WEISS, taken by the
(16) Defendants, pursuant to a Court Order, held
(17) at the offices of FRIEDMAN, FRIEDMAN,
(18) CHIARAVALLOTI & GIANNINI, ESQS., 2 Rector
(19) Street, 21st Floor, New York, New York 10006,
(20) before a Notary Public of the State of
(21) New York.
(22)
(23)
(24)
(25)

Page 2

(1)
(2) A P P E A R A N C E S:
(3)
(4) FRIEDMAN, FRIEDMAN, CHIARAVALLOTI
    & GIANNINI, ESQS.
(5) Attorneys for Plaintiff
    2 Rector Street, 21st Floor
(6) New York, New York 10006
    BY: MARIANGELA CHIARAVALLOTI, ESQ.
(7)
(8)
(9) DESENA & SWEENEY, LLP.
    Attorneys for the Defendant
(10) FRANCES M. CREEM
    1383 Veterans Memorial Highway
(11) Suite 32
    Hauppauge, New York 11788
(12) BY: SHAWN O'SHAUGHNESSY, ESQ.
(13)
(14)
    LAW OFFICE OF JAMES G. BILELLO & ASSOCIATES
(15) Attorneys for the Defendant
    BETTY M. OLSON
(16) 875 Merrick Avenue
    Westbury, New York 11590
(17) BY: JOHN W. KONDULIS, ESQ.
(18)
(19)
(20) * * *
(21)
(22)
(23)
(24)
(25)

Page 3

(1)
(2) J U D I T H  H. W E I S S, called as a
(3) witness, having been first duly sworn by a
(4) Notary Public of the State of New York, was
(5) examined and testified as follows:
(6) EXAMINATION BY
(7) MR. O'SHAUGHNESSY:
(8) Q. Please state your name for the
(9) record.
(10) A. Judith Hannah Weiss.
(11) Q. Where do you reside?
(12) A. 595 Old Drivers Hill Road,
(13) Scottsville, Virginia, 24590.
(14) Q. Good morning, Miss Weiss. My name
(15) is Shawn O'Shaughnessy. I'm with the firm of
(16) DeSena & Sweeney. We represent one of the
(17) defendants in this action. I'm going to be
(18) asking you a series of questions this morning.
(19) If at any time you don't understand my
(20) question, please let me know and I will
(21) rephrase it or have it repeated for you.
(22) However, if you provide an answer, I'm going to
(23) assume you understood my question.
(24) If at any time I ask you for a
(25) distance or a time, please provide me with an

Page 4

(1)
(2) approximation, but do not guess. If you need a
(3) break for any reason, we will be happy to
(4) accommodate you with one caveat; if there is a
(5) question pending, I'm going to ask you to
(6) answer that question before we take a break.
(7) Do you understand these
(8) instructions?
(9) A. Yes.
(10) (Whereupon, an off-the-record
(11) discussion was held.)
(12) Q. How long have you lived at the
(13) address you provided?
(14) A. Lived there full-time or owned the
(15) house?
(16) Q. Why don't we say owned the house.
(17) A. I think I've owned the house about
(18) three years, I'm not sure. My memory isn't
(19) good, but I owned the house before I lived in
(20) it full-time, and I think I've lived in it
(21) full-time since December 23rd of last year,
(22) which would be '06.
(23) Q. Do you currently own any other
(24) residences?
(25) A. No.

Page 5

(1)
(2)    Q.    At any time since September of
(3) 2006, have you owned any other residences?
(4)    A.    Yes. I sold my home that I used to
(5) live in.
(6)    Q.    Where was that?
(7)    A.    Saddle – Upper Saddle River, New
(8) Jersey.
(9)    Q.    Was that an apartment, a home,
(10) something else?
(11)    A.    A home.
(12)    Q.    The home you currently live in, is
(13) that a private home?
(14)    A.    Private home.
(15)    Q.    Since September of 2006, have you
(16) resided with anyone?
(17)    A.    With anyone?
(18)    Q.    Yes.
(19)    A.    As in a human being?
(20)    Q.    Yes.
(21)    A.    No.
(22)    Q.    Do you reside with pets or animals?
(23)    A.    Yes.
(24)    Q.    Which?
(25)    A.    I have a golden retriever, who is a

Page 6

(1)
(2) pet therapist, and a cat.
(3)    Q.    When you say a pet therapist, what
(4) do you mean?
(5)    A.    He and I have been volunteers for
(6) six or seven years in hospitals and hospices in
(7) programs which use certain certified animals to
(8) – just give me a minute. To – um, help
(9) patients who are either in pain, undergoing
(10) chemo, or – or actually, some of them are
(11) stroke victims or have some other issues
(12) communicating, and the presence of the
(13) certified pet often helps them with their
(14) issues.
(15)    (Whereupon, an off-the-record
(16) discussion was held.)
(17)    Q.    Can you tell me how you got started
(18) with the pet program?
(19)    A.    How I got started? It's the Lego
(20) blocks. Can I explain that?
(21)    MS. CHIARAVALOTTI:    Use the Lego
(22) blocks.
(23)    A.    I feel like my life, my brain or
(24) something, you know – is composed of Lego
(25) blocks, do you know what they are?

Page 7

(1)
(2)    Q.    Sure.
(3)    A.    And some of them are missing now,
(4) and I can't replace them, and a lot of them –
(5) the Lego blocks that are missing might be Lego
(6) blocks that – for example, might occur today,
(7) like you might say, do you want such and such
(8) sandwich, and I might forget whatever you said

(9) and that Lego block will be missing. So, that
(10) would be today's Lego block. But there are a
(11) lot of other Lego blocks that are missing, so I
(12) really have to think about these answers.
(13)    Q.    Please do.
(14)    A.    And it used to be before this
(15) happened to me that I knew all these answers,
(16) because I worked in media. I worked very fast
(17) for very major companies. I remember that my
(18) first pet therapy job - it's not a job for
(19) money, it's a volunteer job – was at
(20) Blythedale Children's Hospital.
(21)    Q.    Is that in New Jersey?
(22)    A.    It's in New York State.
(23) Westchester County, and I don't remember the
(24) name of the town at the moment. It might be
(25) Valhalla, but it might not be. I forgot your

Page 8

(1)
(2) question. What was it?
(3)    Q.    Can you give me an approximation as
(4) to when you got started with this program?
(5)    A.    The program that I'm doing with my
(6) current dog, about six years ago. The original
(7) program was not with this dog. Do you want
(8) that answer?
(9)    Q.    The first time you started.
(10)
(11)    A.    In any pet therapy program?
(12)    Q.    Yes.
(13)    A.    Um, I was in college. Um – now
(14) I'm 58, I guess 40 years ago. I did a lot of
(15) volunteer work in hospitals, it was not all pet
(16) therapy.
(17)    Q.    Was there a specific reason that
(18) you decided to start with this program,
(19) approximately 40 years ago? That was the date
(20) you gave me?
(21)    A.    Yeah. Um, I cared about kids. I
(22) was doing pediatric care only at that time and
(23) I cared about the kids.
(24)    Q.    When you say you were doing
(25) pediatric care, is that associated with a

Page 9

(1)
(2) medical degree, or something else?
(3)    A.    No. I was a college student and I
(4) just cared about the kids, and at the time I
(5) was working. At the time when I was doing
(6) that, I was also working with a theatre group
(7) called The Paper Bag Players, which was a
(8) theatre group for kids and we went into
(9) hospitals, you know, through some grant – and
(10) the grant – this is what happens to my voice
(11) – and the grant would put us, for example, at
(12) NYU hospital or whatever hospital, and I would
(13) see the pediatric kids, for some reason, I
(14) wanted to extend my own involvement.
(15)    Q.    The dog you currently have – you
(16) said it was a dog, correct?

(15) A. Yes.
(16) MR. O'SHAUGHNESSY: I'm going to
(17) leave a line in the transcript for that
(18) person's name. To the extent you can
(19) remember, with your attorney's
(20) permission, you can fill that in.
(21)
(22) THE WITNESS: I mean I used to get
(23) assistants from college. So, I'd get
(24) one for a few months, one for a few
(25) months.

Page 47

(1)
(2) Q. So, these part-time assistants, did
(3) they have any longevity with your company?
(4) A. Not at all.
(5) Q. How about the bookkeeper?
(6) A. Well, the most recent bookkeeper –
(7) a few years, and before that – my memory –
(8) these are the Lego blocks that are missing.
(9) Q. What is the bookkeeper's name, if
(10) you remember?
(11) MS. CHIARAVALLOTI: We can leave a
(12) line in the transcript.
(13) A. Karen.
(14) MR. O'SHAUGHNESSY: With your
(15) attorney's permission, we will leave a
(16) blank for the last name, if you can
(17) remember it.
(18)
(19) Q. Was there anyone else who would
(20) work either out of your home, your studio, or
(21) any other location that would be employed by
(22) your company?
(23) MS. CHIARAVALLOTI: I don't know
(24) that anyone did work out of her home.
(25) If you want to clarify if anyone worked

Page 48

(1)
(2) out of her home: Who worked out of your
(3) home?
(4) THE WITNESS: My assistant. I had
(5) a cleaning person.
(6) Q. I'm only talking about people who
(7) would work on-the-job duties we have been
(8) discussing.
(9) A. The assistants, and they were
(10) part-time and temporary.
(11) Q. Is it fair to say then, that the
(12) vast majority of the duties were yours?
(13) A. Absolutely.
(14) Q. And that's what the client expected
(15) from you?
(16) A. Absolutely. Everything I did was a
(17) confidentiality situation.
(18) Q. Earlier you referenced that you had
(19) some contracts that you had to cancel. Were
(20) these written contracts?
(21) A. Well, I think they're letters. By
(22) your standards as an attorney maybe you

(23) wouldn't view it as a contract.
(24) Q. Was it in writing?
(25) A. Yes. Well, most of them are. In

Page 49

(1)
(2) media a lot of things are handshakes, but I
(3) think a lot them were in writing, too.
(4) Q. Would you have copies of those?
(5) A. In boxes. I haven't unpacked from
(6) my move. I don't know where anything is.
(7) MR. O'SHAUGHNESSY: I'm going to
(8) call for production of those contracts
(9) for the last year or so.
(10) THE WITNESS: They're not going to
(11) be the kind of contracts you're thinking
(12) of.
(13) MR. O'SHAUGHNESSY: Contracts in
(14) the broader sense. Letters, what you
(15) would be paid, things like. I will
(16) follow that up un writing.
(17) MS. CHIARAVALLOTI: I would request
(18) all of that in writing.
(19) THE WITNESS: You should look at my
(20) tax records if you want to know who I've
(21) been working for.
(22) MS. CHIARAVALLOTI: Judy? Don't
(23) answer anything that's not asked.
(24) Q. Did you also file personal tax
(25) returns?

Page 50

(1)
(2) A. I guess so. My CPA handled that.
(3) Whatever was legal, he did.
(4) Q. Were you ever asked to sign any of
(5) these documents, either corporate or otherwise?
(6) A. I'm sure I had to sign.
(7) MR. O'SHAUGHNESSY: I'm also going
(8) to make a request for personal tax
(9) records, to the extent they have them.
(10) MS. CHIARAVALLOTI: I'm going to
(11) object to personal tax records, it's
(12) irrelevant.
(13) Q. Did you have to pay any monies to
(14) get out of any contracts?
(15) A. Yes.
(16) Q. Did you make those payments?
(17) A. Yes.
(18) Q. Who did you pay to break a
(19) contract?
(20) MS. CHIARAVALLOTI: To be released
(21) from the contract?
(22) Q. Yes.
(23) A. I believe the company was called –
(24) the reason I hesitate on this is a lot of
(25) companies have very, very much smaller

Page 51

(1)
(2) companies for legal reasons, for certain
(3) projects. I believe the name of the company
(4) that I paid was called Healthy Directions, LLC.

(11) defer payment from, let's say 2004 to 2005, for
(12) their reasons, and at the very end of every
(13) year, he would see who was doing what and he
(14) would make the best judgements for me.
(15)  Q. You were talking about putting
(16) money away for, did you say pension or
(17) retirement?
(18)  A. I had a pension plan.
(19)  Q. Were you required to take
(20) distributions from the plan by a specific date
(21) or time?
(22)  A. I don't know.
(23)  Q. Did you have a plan as to when you
(24) intended on taking distributions, either for
(25) retirement or any other reason?

Page 61

(1)
(2)  A. I guess so, but I don't remember.
(3)  Q. Do you have an understanding, as
(4) you sit here today, how many years you intended
(5) to work?
(6)  A. Yes.
(7)  Q. How many?
(8)  A. I thought I would be working at
(9) least until I was 62, full-time, more likely
(10) until I was 65, full-time, and I was aware that
(11) due to my nature as being sort of a – I don't
(12) like to say this because it sounds a little
(13) obnoxious but –
(14)  MS. CHIARAVALLOTI: Don't say it
(15) then.
(16)  A. I have to sort of refer to the fact
(17) that there were not that many people who did
(18) what I do, and who had launched that many
(19) magazines. I would probably have worked into
(20) my 70's, so my plan was that I would probably
(21) have worked part-time until I was about 72.
(22)  Q. If I were to pick up a magazine in
(23) the newsstand, would I see your name on it?
(24)  A. No.
(25)  Q. Would I see your name on the inside

Page 62

(1)
(2) of the magazine at all?
(3)  A. No.
(4)  Q. Were you given credit by anyone,
(5) other than the company that paid you for being
(6) involved with these magazines?
(7)  A. To the companies that paid me, I
(8) was an important asset. And the public at
(9) large, they don't know about people like me.
(10) Even people like you don't know about people
(11) like me.
(12)  Q. Did you receive any awards or
(13) accolades from your peers?
(14)  A. Yes.
(15)  Q. What sorts of awards?
(16)  A. I gave them all to my clients.
(17) Almost every award you can win in magazine
(18) promotion.

(19)  Q. Can you give me an idea of what
(20) some of those are?
(21)  A. There's certain awards called the
(22) John Capeles awards, I know I won a number of
(23) those, but I never kept my awards. I gave them
(24) to my clients that hired me.
(25)  Q. What is the John Capeles award

Page 63

(1)
(2) given for?
(3)  A. Probably for promoting new
(4) magazines, but I don't remember.
(5)  Q. Did you ever win any awards for
(6) design?
(7)  A. No. I'm not specifically a
(8) designer. I'm an inventor. I'm a creator.
(9)  Q. Using your words, for inventing or
(10) creating, did you ever win any awards for that?
(11)  A. I don't think there are awards for
(12) that; they go to freelancers.
(13)  Q. Approximately how many John Capeles
(14) awards have you won?
(15)  A. I don't know.
(16)  Q. More or less than one?
(17)  A. More than one.
(18)  Q. More or less than five?
(19)  A. Of every award I've won, I can't
(20) remember the various ones, probably 20 or 30.
(21)  Q. What was the last one that you won?
(22)  A. I don't know. I never submitted
(23) any of my work for an award. That's what kept
(24) the number down. The only reason I won any was
(25) that the client submitted it.

Page 64

(1)
(2)  Q. Did you win any awards in the years
(3) from 2000 to 2006?
(4)  A. I don't recall any.
(5)  Q. If I were curious to find out award
(6) winners for a specific period of time, would
(7) there be a place I could look to find that?
(8)  A. I don't know, because I didn't
(9) submit the stuff.
(10)  MS. CHIARAVALLOTI: To the extent
(11) we can identify which clients' work that
(12) Judy did got the John Capeles award, we
(13) will attempt to put together a list. I
(14) didn't know about the award until now.
(15) So, I will investigate that. Go to
(16) clients' offices and photograph their
(17) walls.
(18)  Q. What is your height?
(19)  A. Five feet two.
(20)  Q. Your weight?
(21)  A. 109.
(22)  Q. Did you weigh approximately 109 on
(23) the date of the accident?
(24)  A. I don't think so.
(25)  Q. More or less?

Page 65

(1)
(2) A. I would say more.
(3) Q. How much more?
(4) A. I would say 115.
(5) Q. Were you involved in an automobile
(6) accident that we're discussing today?
(7) A. Yes.
(8) Q. When was that accident?
(9) A. September 18, 2006.
(10) Q. What was the day of the week?
(11) A. I don't know.
(12) Q. Was it a weekday, weekend?
(13) A. Weekday.
(14) Q. Early part of the week, middle
(15) part, end of the week?
(16) A. It was early, I think.
(17) Q. What was the time of the accident?
(18) A. I think it might have been about
(19) 1:00 p.m.
(20) MS. CHIARAVALLOTI: Is that a
(21) question or an answer?
(22) THE WITNESS: I don't know.
(23) MS. CHIARAVALLOTI: Well, then you
(24) have to say –
(25) A. I think it was about 1:00 p.m.

Page 66

(1)
(2) Q. What was the location of accident?
(3) A. I don't know what the location was,
(4) but it was on a road, I guess, somewhere near
(5) New Paltz and Kingston, or in between.
(6) Q. Were you a passenger or driver?
(7) A. Passenger.
(8) Q. Whose car was it?
(9) A. That's a good question. I thought
(10) I was driving in a car that belonged to my
(11) realtor, who I just met that day who I knew for
(12) about 20 minutes. Her name was Betty Olson, I
(13) think, but I now wonder if it was her car, or
(14) maybe her husband's car.
(15) MS. CHIARAVALLOTI: Don't
(16) speculate. You thought it was her car,
(17) that's the end.
(18) Q. What makes you believe that it may
(19) not have been her car?
(20) A. Because I saw the license plate
(21) yesterday.
(22) Q. What about the license plate makes
(23) you believe it's not her car.
(24) A. It's the name of her husband's
(25) company.

Page 67

(1)
(2) Q. Do you recall the license plate?
(3) A. No. I don't recall it. You showed
(4) me a picture.
(5) MS. CHIARAVALLOTI: I showed her a
(6) picture of the vehicle and I asked, "Is
(7) this Betty's car?" And then she got
(8) mixed up with the license plate, but she

(9) remembered it was her husband's company.
(10) Q. What kind of car were you in?
(11) A. I wouldn't know. I mean, I know
(12) because she showed me the picture yesterday,
(13) but I wouldn't know. I didn't know. In fact,
(14) I was really surprised when I saw it.
(15) Q. Did you prepare for your deposition
(16) in any way today?
(17) A. No.
(18) Q. Did you prepare with your Counsel
(19) in any way by reviewing any documents or
(20) photographs?
(21) A. Today, no.
(22) Q. Did you prepare for the deposition
(23) by reviewing any documents or photographs
(24) yesterday?
(25) A. I saw photographs yesterday of the

Page 68

(1)
(2) accident.
(3) MS. CHIARAVALOTI: The black and
(4) whites attached to one of the rule 26
(5) submissions.
(6) MR. O'SHAUGHNESSY: For the record,
(7) I belive that's the submission of DeSena
(8) and Sweeney.
(9) Q. Other than telling me what you and
(10) your attorney discussed, did you review any
(11) other documents or papers?
(12) A. No.
(13) Q. What color was the car that you
(14) were in?
(15) A. Well, because I saw it on the
(16) table, I can answer you. Just now I saw it,
(17) but I wouldn't know otherwise.
(18) Q. What color is it?
(19) A. Well, it appears to be red.
(20) MS. CHIARAVALLOTI: There is a
(21) photograph right in front of Counsel
(22) that all of us can see with a red
(23) vehicle, so we're cheating a little bit.
(24) MR. O'SHAUGHNESSY: I'm going to
(25) turn these over.

Page 69

(1)
(2) THE WITNESS: My point is, I don't
(3) know.
(4) Q. Where were you seated in this car?
(5) A. In the passenger seat next to the
(6) driver.
(7) Q. The front seat?
(8) A. Yes.
(9) Q. Can you describe the driver of that
(10) vehicle?
(11) A. Describe her in what way?
(12) MS. CHIARAVALLOTI: Age, skin
(13) color.
(14) Q. Anything you can tell us.
(15) A. She's probably about my age, I
(16) think. She's about my height. She's heavy.